## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACY R. ENGLISH, | CASE NO. 4:14-cv-01841- GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 5, 6, 7, 10 |

## **MEMORANDUM**

### I.    **Procedural Background**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Stacy R. English ("Plaintiff") for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.*, §§416.901 *et. seq.*[1] (the "Regulations").

On September 8, 2011, Plaintiff applied for SSI under the Act. (Tr. 146-60). On October 31, 2011, the Bureau of Disability Determination ("state agency") denied Plaintiff's application (Tr. 80-98), and Plaintiff requested a hearing. (Tr.

---

[1] Part 404 governs DIB, Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

114-15).   On April 24, 2013, an ALJ held a hearing at which Plaintiff's husband,

Plaintiff—who was represented by an attorney—and a vocational expert ("VE")

appeared and testified. (Tr. 38-79).   On May 7, 2013, the ALJ found that Plaintiff

was not entitled to benefits. (Tr. 18-37). On May 1, 2013, Plaintiff requested

review with the Appeals Council (Tr. 17), which the Appeals Council denied on

July 25, 2014, affirming the decision of the ALJ as the "final decision" of the

Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On September 22, 2014, Plaintiff filed the above-captioned action pursuant

to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On

December 15, 2014, the Commissioner filed an answer and administrative

transcript of proceedings. (Docs. 5, 6). On January 29, 2015, Plaintiff filed a brief

in support of the appeal ("Pl. Brief"). (Doc. 7). On April 3, 2015, Defendant filed a

brief in response ("Def. Brief"). (Doc. 10). Plaintiff did not file a brief in reply. On

November 3, 2015, the parties consented to the adjudication of this case by the

undersigned. (Doc. 13, 14). The matter is now ripe for review.

## II.    Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d

1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## III.   Relevant Facts in the Record

Plaintiff was born in 1978 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 31); 20 C.F.R. § 404.1563. Plaintiff graduated high school. (Tr. 31). She has past relevant work as machine operator. (Tr. 31). She performed this job for a single employer for twelve years after graduating high school. (Tr. 164-66). Diagnostic imaging studies indicated multiple sclerosis in 2002, when she was 21 years old, after a "gradual

onset of severe aphasia." (Tr. 266).[2]  She had been a lead position for a time, but lost this position because of her communication problems. Plaintiff stopped working again in mid-May, 2010, after an MRI indicated that her multiple sclerosis had progressed. (Tr. 263-66). After several months of treatment with intravenous Copaxone, she was able to return to work in November of 2010. (Tr. 258-59). She reported that she stopped working again in March of 2011 because of increasing numbness in her extremities. (Tr. 258-59). She also reported that she "did not think she could learn to operate new machines due to her memory problems." (Tr. 316). She alleges onset as of March 10, 2011. (Tr. 80).

The March 2010 MRI notes "[p]rogression of periventricular and subcortical white matter changes consistent with multiple sclerosis is observed since previous examination of 11/12/02." (Tr. 268). Specifically, it states:

> [M]uch more extensive white matter changes in the right cerebral periventricular white matter especially in the frontal and peritrigonal areas. The changes in the left frontal corona radiata and centrum semiovale are also more pronounced. No enhancement is currently observed to indicate an active plaque. Previously observed areas of enhancement involving the right frontal periventricular region and the

---

[2] "The loss or impairment of one's ability to express thoughts and ideas by means of speech, writing, and signs (or gestures); and/or to understand speech, writing, and sign language. The condition of aphasia is *not* due to a mechanical defect in the structures of the speech organs, the eyes, or the hearing organs; it is due to the loss by the brain of its ability to interpret the information received from the eyes or ears, and to send out the directing impulses to the organs involved in speech, writing, etc." *Aphasia*, 1-A Attorneys' Dictionary of Medicine A-972 (Bender 2014).

right frontal subcortical area above the insular cortex no longer enhance.

There is mild prominence of perivascular spaces and ventricles not unusual in patients with multiple sclerosis. Axial diffusion trace images reveal bright signal in subcortical U fibers of the right frontal corona radiata consistent with a "shine through."

(Tr. 268). She was reporting with depression, anxiety, poor sleep, pain in her left eye when it moved, and numbness in her hands and feet to her primary care physician, Dr. J. Kevin Parry, M. (Tr. 263-66).

Dr. Parry "wrote her a letter to be off [work from] July 1st [2010] indefinitely." (Tr. 263). He "hope[d] she can get back to work at some point." (Tr. 263). He opined that "she might need to be on disability for a half year or a year and hopefully get back to work at [her same employer]." (Tr. 263). He indicated that "a lot of her issues I think are emotional right now." (Tr. 263). He prescribed Copaxone, and Plaintiff's mother "sort of [took] over the care" after Plaintiff was noncompliant. (Tr. 263). Plaintiff's mother or husband helped her inject the Copaxone, as she was afraid of the needle. (Tr. 48, 258).

In September of 2010, Plaintiff was "non-compliant with Zoloft but she is taking her Copaxone." (Tr. 262). Her "big issue [was] fatigue" and Dr. Parry opined that she could return to work on November 1, 2010. (Tr. 262).

Plaintiff returned to work. However, she reported to Dr. Parry that she stopped working on March 1, 2011 "because she was getting numb in her

extremities and her supervisor apparently told her to just go home." (Tr. 258). She had "not taken her Copaxone again." (Tr. 258). Dr. Parry "pointed out that her MRI from last year was significantly worse than the MRI of 2002" and did "not know how to get her to take the medicine." (Tr. 258). Dr. Parry indicated "[w]e will try to get the disability reinstated…short term because if it is long term then she loses her job at First Quality." (Tr. 258). Plaintiff reported marital strife, and Dr. Parry opined that Plaintiff's "learning disability…[was] contributing to her inability to function socially." (Tr. 259). He wrote that Plaintiff was medically disabled now due to her Multiple Sclerosis and her cognitive disability." (Tr. 257).

In October of 2011, state agency medical experts Dr. Mark Hite, Ed.D, and Dr. Theodore Waldron, D.O., reviewed Plaintiff's file and authored medical opinions. (Tr. 84). Both opined that Plaintiff could perform full time work on a regular and continuing basis. (Tr. 82-84).  Dr. Hite wrote that Plaintiff's Function Report had "not been returned." (Tr. 82). The only abnormality cited in the opinions was the brain MRI showing "progression of periventricular & subcortical white matter changes." (Tr. 83). Dr. Hite, who assessed Plaintiff's mental capacity, explained that Plaintiff's only treatment for mental health impairments was an anti-depressant from Dr. Parry, and her mental status examination was normal. (Tr. 83). Dr. Hite opined that Plaintiff had no restriction of activities of daily living or

maintaining social functioning. (Tr. 83). The only explanation provided by Dr. Waldron was "MS." (Tr. 83).

On October 19, 2011, Plaintiff completed a Function Report. (Tr. 195). She reported problems squatting, standing, walking, kneeling, talking, climbing stairs, memory, completing tasks, concentrating, using her hands, and getting along with others. (Tr. 193). She reported that she does not finish what she starts and can pay attention for ten minutes. (Tr. 193). She reported that she was not very good at handling stress. (Tr. 194). She reported that she needed reminders to take medication or perform chores and did not know how to cook. (Tr. 190). She reported that she cared for her children with her mother's assistance and felt "more tired and exhausted." (Tr. 189). She explained that she would "lose train of thought," experienced "speech troubles," and that her extremities "go numb." (Tr. 188). Plaintiff's mother had authored a Function Report on September 27, 2011. (Tr. 170). Plaintiff's mother indicated the same limitations, along with dizziness, frustration, moodiness, problems following instructions, and unusual fears or behaviors. (Tr. 170-76).

In February of 2012, Plaintiff followed-up with Dr. Parry. (Tr. 301). He noted that Plaintiff had "been non-compliant with medication in the past" but had "been on Copaxone now since June 2011 pretty much daily." (Tr. 301). Dr. Parry noted "cognitive issues with memory and attention…below average intelligence."

(Tr. 301). Plaintiff reported "scattered paresthesias in the extremities" and feeling "somewhat weak and clumsy in her hands." (Tr. 301). Plaintiff's "general fund of knowledge [was] poor" with "some weakness in the right side about 4+/5 in the arm and leg." (Tr. 302). She had "a low-amplitude, high frequency tremor in the out-stretched hands and with use," increased reflexes on the right "with clonus at the right ankle," an "upgoing toe on the left" and a "down going toe on the right." (Tr. 302). Dr. Parry prescribed a prednisone taper and referred Plaintiff to neuropsychological testing. (Tr. 302).

On May 10, 2012, Plaintiff underwent neuropsychological testing with Dr. Tara Kane, Ph.D, and Dr. Bradley Wilson, Ph.D. (Tr. 312). Her husband was also present. (Tr. 315). Plaintiff and her husband "reported difficulties with memory, talking, and walking for the past 10 years," concentration problems, worsening impulsivity, language comprehension, and a greater decline in memory than speech. (Tr. 315). Plaintiff reported that she had consistently taken Zoloft over the past year for depression. (Tr. 316). They reported fatigue, mood swings, poor sleep, and low energy levels. (Tr. 316). Dr. Kane and Dr. Wilson performed the following procedures:

> Medical record review, Clinical interview, Wide Range Achievement Test - 4th Edition (WRAT-4; Word Reading, Math Computation), Wechsler Adult Intelligence Scale - 4TH Edition (WAIS-IV), Neuropsychological Assessment Battery (NAB; Memory Module, Visual Discrimination Test, Naming Test), Oral Trails, Controlled Oral Word Association (FAS, Animals), Modified Wisconsin Card

Sorting Test (MWeST), Forced Choice Test (Meyers), Beck Depression Inventory - 2d Edition (BDI-II), Beck Anxiety Inventory (BAI)

(Tr. 317). The process included a "Clinical Interview plus 6 Hours Neuropsychological Assessment." (Tr. 319).

Examination indicated slow motor activity, slow speech, mild occasional dysarthria and misarticulation of words and letters, and many other objective abnormalities. (Tr. 316-18). Plaintiff was able to read at a third-grade level and do math at a fourth-grade level. (Tr. 313). Her full scale IQ was 74. (Tr. 313). Dr. Kane and Dr. Wilson opined that:

> [T]he combination of borderline intellectual functioning and MS, which can be associated with additional processing speed, working memory, and encoding deficits, as well as neuropsychiatric problems and fatigue, would be anticipated to markedly impair Ms. English's ability to function effectively at a job on a daily basis. It is our opinion that the current assessment supports disability status.

(Tr. 318). Dr. Kane and Dr. Wilson opined that "Plaintiff "appeared to make adequate effort throughout testing" and the "results [were] judged to provide a valid reflection of her current cognitive status." (Tr. 316).

In August of 2012, Plaintiff followed-up with Dr. Parry. (Tr. 344). Dr. Parry noted that:

> She has been very non-compliant with her medication but now she is taking her medication Copaxone. Still missing 4 to 5 days a month. Stacy by her report and her mom's confirmation had a very high IQ in high school, but a reading disability. We just sent her to Danville to get some neuropsych testing, and her full scale IQ came back at 74 so

I would assume that the decline is due to the multiple sclerosis lesion load which is not insignificant based on prior imaging studies.

(Tr. 344). Plaintiff reported paresthesias in the left hand and also some sporadic weakness in the left leg "particularly if she has exerted herself." (Tr. 344). Dr. Parry noted, "she is slow I think mentally." (Tr. 344). Plaintiff's "general fund of knowledge is poor." (Tr. 345). Examination was otherwise normal. (Tr. 345).

On December 17, 2012, Dr. Parry authored a letter that states:

Stacy English is a patient of mine who I treat for multiple sclerosis. We first met in 2001. She presented with aphasia. Our workup included magnetic resonance imaging of the brain which was consistent with multiple sclerosis. Her history, her exam and the MRI findings were consistent with the disease. She was initially on Avonex as a disease modifying agent and then more recently she has been on Copaxone as a disease modifying agent. She comes to the office about twice a year. The medication seems to be helping to some degree. However, she suffers considerably mostly from cognitive deficits, memory, attention, and concentration. Still has some language difficulties. Also fatigue, poor endurance, and depending on relapses , she has had sporadic weakness, discoordination, and paresthesias. Limitations on Stacy's activities result mostly from her cognitive deficit but as I said she does suffer sporadically from discoordination, weakness, and paresthesias. Prognosis is poor. I do not expect a significant recovery. We are just trying to keep things stable. This condition certainly will exceed 12 months in duration. I do not feel the patient can do full time "competitive work". I do feel she is disabled and I expect this to last more than a year.

(Tr. 346).

On March 21, 2013, Dr. Parry completed a Multiple Impairment Questionnaire. (Tr. 332). He opined that Plaintiff's prognosis was "poor." (Tr. 332). He opined that Plaintiff's primary symptoms were cognitive deficits, fatigue,

and poor concentration. (Tr. 333). He opined that Plaintiff could not work a full eight hours in an eight-hour workday, had marked limitations in grasping, turning, and twisting objects, could not lift more than five pounds. (Tr. 335). He opined that Plaintiff's symptoms would "likely increase" if she was "placed in a competitive work environment." (Tr. 336). He opined that Plaintiff's experience of fatigue or other symptoms would "frequently" interfere with her concentration and was incapable of even "low stress" jobs because of her low IQ. (Tr. 337). He opined that Plaintiff would "often" need additional breaks, would have "good days" and "bad days," would be absent more than three times per month, and suffered other limitations. (Tr. 338). He opined that these symptoms had been present since February of 2012. (Tr. 338).

On April 24, 2013, Plaintiff and her husband appeared and testified. (Tr. 39). She testified that her family was living with her parents. (Tr. 43). She testified that she stopped working in March of 2011 because her right hand was numb. (Tr. 46). She testified that her left hand and lower extremities would also go numb, sometimes for two weeks at a time. (Tr. 47). She explained that when her lower extremities were numb she walked with a limp because she could not lift her leg high enough. (Tr. 47). She testified that she was compliant with her medications. (Tr. 47). She testified that her memory problems and fatigue were constant, and her speech problems would "come and go." (Tr. 49). She testified that she did not

know how to cook. (Tr. 51). She testified that she did not read or pay bills, but could play on the computer. (Tr. 52). She testified that she could sit for an hour at a time and stand for an hour at a time. (Tr. 54). She reported that, after walking for two blocks, she would "feel real tired and out of breath" and sometimes like she was "starting to limp." (Tr. 54). She testified that she did not drive more than fifteen minutes and gets lost "a lot" when she drives. (Tr. 56). She explained that she had taken more than two hours to drive somewhere that was only fifteen minutes away. (Tr. 56). She testified that she had problems sleeping and took breaks when she did chores. (Tr. 58). She testified that she had problems playing with her children because of her fatigue and memory problems. (Tr. 58). She testified to continued mood swings. (Tr. 60).

Plaintiff's husband also appeared and testified. (Tr. 61). He testified that:

She's struggling more with helping the kids because she can't verbalize as well. She's also having difficulty with dexterity in her hands and stuff like that. A lot more frequent times when she can't keep up, can't walk, she starts to have trouble, trouble with her legs, feet bothering her. Other than that she's just more prone to outrage and pushing it towards violence. She gets mad real quick and then tries to get you to hit her because she wants to fight.

…

She'll sit something down and forget she put it down. She'll start a chore or start a project and then forget about it. Our daughters especially they'll ask her for a drink or snack and she'll wait a minute, wait a minute, I'm busy, and then she forgets that they asked. So it causes fights and arguments between them, really upsets the kids quite a bit. And then short-term memory just period. You can have a

conversation with her and a short time later she forgets it. She'll remember stuff from 12, 13 years ago when I met her very easily, but she can't remember what happened last week or the conversation you had last, last month. It just doesn't exist to her any more.

…

Certain [television] programs she can't really follow. The things that she watches all the time -- she tends to watch a lot of reruns. It'll be the same episode that she saw before movies are the same way, she'll watch the same movie for four or five days in a row. So the more often she watches it, then the more often she's able to comprehend it and follow it.

… Over the years [her temper] has actually pushed away my friends, because they don't want t o interact with her, don't like to deal with the mood swings and, and t he temper all the time.

… Over the years [her social function has] gotten different. Even when we first met she didn't really like to be in large groups, however she would still socialize and go out and be involved with smaller groups. Even so far as a group of coworkers and us would go to the bar and she would be okay with it, now she gets around more than five or six people and she just doesn't want t o be there… she doesn't like t o be out around them because s he feels stupid when she's trying to talk to them.

…

When we're staying at my parent's house, nothing, won't do laundry, won't help with dishes or anything like that, won't help me prepare meals. At her parent's house she does do the laundry, but it's -- and does occasionally try to help vacuum, but that's generally because her mom's yelling at her and making her do it. But when she gets to doing things like that it'll take her all day to wash clothes. She'll either forget that they'll in the washer or she'll start and stop, she can't multi-task and like vacuum and wash clothes at the same time because something doesn't get done, she forgets to do it, forgets to finish it. But even at that when she's doing those things it's work for five minutes, take a half-hour break, work for 10 minutes, take a half-hour break. It's constantly and consistently like that.

…

When they were younger -- you know, obviously at the time she was working, but when she would come home from work she would spend a lot of time with the kids. She would play with them on the floor, she would try to read to them and struggle through that. As they've gotten older and as she's this changed, and I believe gotten worse, is like a struggle to g e t her to do something with the kids. She'll get into something where she can focus her attention, and then when the kids want her to go play or go do something, it's always, no, not right now, I'm busy, no, I'm playing this video game, no, I'm on the computer. And then it's a fight and argument back and forth and I don't know whether it's she just doesn't want to do it with the kids or she knows she can't do it with the kids, so she tells the kids no. But it's leaving the kids lacking the attention that they need from her.

(Tr. 62-68).

On May 7, 2013, the ALJ issued the decision denying benefits. (Tr. 32). The findings relevant to this appeal are discussed in detail below.

## IV.   Plaintiff Allegations of Error

### A.   Medical Opinions

Plaintiff asserts that the ALJ erred in assigning more weight to the non-treating, non-examining medical opinions than the treating source medical opinions. (Pl. Brief). "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight" ("treating source rule"). *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ must meet stricter standards to resolve an evidentiary conflict against a treating source medical opinion than the ALJ must meet to resolve other evidentiary conflicts. *See* 20 C.F.R. §404.1527(c). The ALJ resolves other

evidentiary conflicts pursuant to the deferential substantial evidence standard, where the Court upholds the resolution if any reasonable person would have done the same. *See Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). In contrast, in order to resolve an evidentiary conflict against a treating source medical opinion, the ALJ must provide "good" reasons. *See* 20 C.F.R. §404.1527(c)(2). "Good reasons" must be higher than substantial evidence, otherwise, the "good reasons" language would be superfluous. *See Bilski v. Kappos*, 561 U.S. 593, 607–08, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) (internal citations omitted) (Court may not interpret "any statutory provision in a manner that would render another provision superfluous"); *see also* Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at *36936 ("as long as the treating source is someone entitled to special deference, and all other factors are equal, we will always give more weight to treating source medical opinions than to opinions from other sources").

SSR 96-6p provides that a non-treating, non-examining medical opinion may be assigned greater weight than a treating medical opinion in "appropriate circumstances." SSR 96-6p, 1996 WL 374180 at *3 (July 2, 1996). SSR 96-6p does not define "appropriate circumstances," but provides an example: when the non-treating, non-examining source was able to review a "complete case record…which provides more detailed and comprehensive information than what

was available to the individual's treating source." *Id.* This example does not constitute the only possible appropriate circumstance to assigning greater weight than a treating medical opinion, but the phrase "appropriate circumstance" should be construed as a similarly compelling reason. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223, 128 S. Ct. 831, 838, 169 L. Ed. 2d 680 (2008) ("when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration").

The Third Circuit has addressed the treating source rule in four precedential cases since it was codified in 1991. *See Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011); *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009); *Brownawell v. Comm'r Of Soc. Sec.*, 554 F.3d 352, (3d Cir. 2008); *Morales*, 225 F.3d at 317. The only case affirming an ALJ who rejected a treating source medical opinion was *Brown*, where the ALJ relied on two consistent medical opinions to reject the treating source medical opinion, one from an expert who reviewed the complete record through the hearing date. *Brown*, 649 F.3d at 196; *see also Labarre v. Colvin*, No. 1:14-CV-02484, 2016 WL 613593, at *7 (M.D. Pa. Feb. 16, 2016); *Davern v. Colvin*, No. 115CV00162CCCGBC, 2016 WL 702979, at *10 (M.D. Pa. Jan. 20, 2016) *report and recommendation adopted,* No. 1:15-CV-162, 2016 WL 695114 (M.D. Pa. Feb. 19, 2016) ("multiple consistent opinions…provide substantial evidence for the ALJ's RFC assessment"); *Bergstresser v. Colvin*, No.

3:15-CV-1744, 2016 WL 539038, at *10 (M.D. Pa. Feb. 11, 2016) (Noting that ALJ credited a medical opinion that was "consistent with" another medical opinion).

In *Brownawell* and *Morales*, the Third Circuit held that a single non-treating medical opinion was not sufficient to reject a treating source medical opinion. *See Brownawell*, 554 F.3d at 352; *Morales*, 225 F.3d at 317. In *Morales*, the Third Circuit explained that "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Id.* In *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009), there were three non-treating medical opinions and one treating medical opinion, but the Court held that the non-treating medical opinions did not provide good enough reason to reject the treating source medical opinion because they were "perfunctory" and omitted significant objective findings. *Id.* at 505; *see also Boyer v. Colvin*, No. CV 1:14-CV-730, 2015 WL 6438870, at *9 (M.D. Pa. Oct. 8, 2015) (Non-examining state agency opinion was insufficient to reject treating source opinion where state agency physician "mischaracterized the record").

*Morales* also emphasized that the non-treating, non-examining source reviewed an incomplete case record. *See Morales*, 225 F.3d at 314 (non-treating, non-examining source "review[ed] [claimant's] medical record which…did not include [two physicians'] reports"); *see also Kreiser v. Colvin*, No. 3:15-CV-1603, 2016 WL 704957, at *13 (M.D. Pa. Feb. 23, 2016) (Noting that expert "reviewed records…through November 2012" and "the record does not appear to contain….treatment records which post date [the expert's] opinion").

Defendant frequently cites three additional cases in support of an ALJ who rejects a treating source medical opinion with only a single non-examining, non-treating medical opinion: *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011); *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999); and *Jones v. Sullivan*, 954 F.2d 125 (3d Cir. 1991). However, *Jones* was: (1) decided before 20 C.F.R. §404.1527 and SSR 96-6p were promulgated and (2) involved an ALJ who relied on two state agency medical opinions that corroborated each other to reject the treating source medical opinion. *See Jones*, 954 F.2d at 129 (ALJ may disregard the opinion of a treating physician if "two physicians in the state agency evaluated the medical findings...and concluded that those findings did not reveal any condition that would preclude gainful employment").

Neither *Chandler* nor *Plummer* implicate the treating source rule. *See Chandler*, 667 F.3d at 360-63; *Plummer*, 186 F.3d at 430. In *Plummer*, the ALJ did

not have to resolve a conflict against treating source opinions because the ALJ relied on three other treating source opinions that the claimant was not disabled. *Id.* In *Chandler*, there were no treating source medical opinions before the ALJ. *Id.* at 360-63. There were statements from a nurse practitioner, but a nurse practitioner is not an acceptable medical source. *Id.* Statements from individuals who are not acceptable medical sources must be considered, but they are excluded from the definition of medical opinion. *Id.*; 20 C.F.R. §404.1527(a). Consequently, they may never be entitled to controlling weight and are not entitled to the treating source rule. *See* 20 C.F.R. §404.1527(c)(2). In *Chandler*, the claimant did submit two medical opinions in support of her claim, but not until after the ALJ decision. *Chandler*, 667 F.3d at 360. The Third Circuit excluded these from consideration because Plaintiff had no good cause for not submitting them until after the ALJ decision. *Id.* (citing *Matthews v. Apfel*, 239 F.3d 589, 595 (3d Cir. 2001). Consequently, there was only one medical opinion before the ALJ: an uncontradicted medical opinion from a state agency physician that the claimant was not disabled. *Chandler*, 667 F.3d at 360-63.

This case is like *Morales*, because the ALJ relied on only a single non-examining, non-treating source medical opinion, erroneous lay inferences gleaned from medical records, and an erroneous characterization of the non-medical evidence to reject each treating source medical opinion. *See Morales*, 225 F.3d at

317. This case is also like *Brownawell*, because there were two opinions that corroborated each other and supported Plaintiff's claim for benefits. *See Brownawell*, 554 F.3d at 357.

This case is unlike *Brown*, as the non-treating, non-examining sources authored the only opinions supporting the denial, and he was unable able to review a complete case record. *See Brown,* 649 F.3d at 194; *see also* SSR 96-6p. In particular, neither non-treating, non-examining source reviewed the six hours of neuropsychological testing performed by Dr. Kane and Dr. Wilson. (Tr. 82, 312). Moreover, Plaintiff did not author her function report until October of 2011, and it appears that her function report was not in the record at the time these opinions were authored. (Tr. 82, 195). Moreover, the only significant evidence of a cognitive defect, as opposed to depression, was submitted after Dr. Hite's opinion. (Tr. 301, 312, 344-45). Consequently, in order to reject Dr. Parry's opinion and Dr. Kane's and Dr. Wilson's opinion, the ALJ had to independently reinterpret significant medical evidence. *See Austin v. Colvin*, No. 1:13-CV-02878-GBC, 2015 WL 4488333 (M.D. Pa. July 23, 2015) (ALJ's assessment of medical opinions must be viewed in light of *Ferguson v. Schweiker*, 765 F.2d 31, 37, 36-37 (3d Cir. 1985), which prohibits lay reinterpretation of medical evidence); *Staudt v. Colvin*, No. 1:13-CV-2904, 2015 WL 1605574, at *10 (M.D. Pa. Apr. 9, 2015).

This case is also like *Diaz*, as Dr. Hite's and Dr. Waldron's opinions are more cursory. *Diaz*, 577 F.3d at 506. The only abnormality cited in the opinions was the brain MRI showing "progression of periventricular & subcortical white matter changes." (Tr. 83). Dr. Hite, who assessed Plaintiff's mental capacity, characterized her mental status examination as normal. (Tr. 83). Dr. Hite opined that Plaintiff had no restriction of activities of daily living or maintaining social functioning, despite significant reports of marital strife and other social problems. (Tr. 83). The only explanation provided by Dr. Waldron was "MS." (Tr. 83). This is plainly insufficient. *See* 20 C.F.R. § 404.1527(c)(3) ("because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.").

The Court must consider the binding precedent in *Morales*, *Brownawell*, and *Diaz* for proper evaluation of the treating source opinions, along with SSR 96-6p, which is "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *see also Morales*, 225 F.3d at 317; *Brownawell*, 554 F.3d at 357; *Diaz*, 577 F.3d at 506; *Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016) ("When binding precedent squarely

addresses an issue, the District Court may not deviate from that precedent based on dicta.") (citing *Bd. of Trustees of Bricklayers & Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Associates, Inc.*, 237 F.3d 270, 275 (3d Cir.2001) ("To the extent it applied dicta ... the District Court erred")); 20 C.F.R. § 404.985(a)("We will apply a holding in a United States Court of Appeals decision that we determine conflicts with our interpretation of a provision of the Social Security Act or regulations unless the Government seeks further judicial review of that decision or we relitigate the issue presented in the decision"). Pursuant to these cases, the Court will carefully scrutinize a decision denying benefits despite a supporting treating source medical opinion based only on a single non-examining, non-treating medical opinion. Here, the only evidence that contradicted each treating source opinion was a single non-examining, non-treating medical opinion that was perfunctory and omitted key evidence. None of the rationales provided by the ALJ provide "good reasons" to reject the ALJ. 20 C.F.R. §404.1527(c)(2). This case does not present "appropriate circumstances" to credit non-examining, non-treating medical opinions over treating source medical opinions. *See* SSR 96-6p. The Court remands for the ALJ to properly address the treating source opinions.

## B.    Remedy

Remand, rather than reversal and award of benefits, is the appropriate remedy in this case. The ALJ should be afforded the opportunity to develop either

non-medical evidence or medical opinion evidence to support the denial of benefits. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted)).

## V.    Conclusion

The Court finds that the ALJ's decision lacks substantial evidence because the ALJ failed to properly evaluate the vocational evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.


Dated: March 31, 2016                    _____s/Gerald B. Cohn_____
                                         GERALD B. COHN
                                         UNITED STATES MAGISTRATE JUDGE